FILED '07 FEB 07 14 56USDC-ORP

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| STACK METALLURGICAL SERVICES, INC., | ) ) ) | |
| Plaintiff, | ) ) | Civil No. 05-1315-JE |
| v. | ) ) | OPINION AND ORDER |
| THE TRAVELERS INDEMNITY COMPANY OF CONNECTICUT, | ) ) ) | |
| Defendant. | ) ) | |

Bruno J. Jagelski
Yturri Rose, LLP
89 S.W. 3rd Avenue
P.O. Box "S"
Ontario, Oregon 97914-0058

Emil R. Berg
Attorney at Law
5186 East Arrow Junction Drive
Boise, Idaho 83716-8645

     Attorneys for Plaintiff

1 - OPINION AND ORDER

John A. Bennett
Holly E. Pettit
Margaret M. Van Valkenburg
Bullivant Houser Bailey, P.C.
300 Pioneer Tower
888 S.W. 5th Avenue
Portland, OR 97204-2089

    Attorneys for Defendant

JELDERKS, Magistrate Judge:

    Plaintiff Stack Metallurgical Services, Inc. (Stack) brings this action alleging that defendant The Travelers Indemnity Company of Connecticut (Travelers) has not compensated it for losses as required under various provisions of an insurance policy it purchased from Travelers. The parties' cross motions for summary judgment are pending. For the reasons set out below, defendant's motion for summary judgment is granted in part and denied in part, plaintiff's motion for summary judgment is denied, and plaintiff's alternative motion for partial summary judgment is granted in part and denied in part.


### BACKGROUND

    Plaintiff Stack, a metallurgical services company, operates a facility in Portland, Oregon. Stack specializes in heat-treating metal parts and assemblies for its customers. At the time of the events giving rise to this action, Stack did not manufacture any of its own parts or products. Instead,

2 - OPINION AND ORDER

its business consisted entirely of heat-treating parts and
products that belonged to its customers.

One of Stack's customers, Doncasters PED Manufacturing
(Doncasters), manufactures orthopedic castings that are
implanted in human patients.  During times relevant to this
action, Doncasters purchased heat-treatment processing
services from Stack pursuant to an agreement between those
entities.  Doncasters approved a specialized vacuum furnace
that Stack used in the heat-treating process.  That furnace
was specially certified for use in heat-treating medical
castings produced by Doncasters, and was purchased with the
understanding that it would be used primarily for treating
Doncasters' products and would be used for other work only
when not needed for processing Doncasters' products.
Doncasters' medical castings were in Stack's care, custody,
and control while they were at Stack's facility for
processing.

On February 24, 2004, a Stack employee who was operating
the special vacuum furnace discovered a black deposit on the
wall of the furnace.  Upon inspection, it was determined that
the deposit was organic material.  Stack's management decided
to clean the furnace and continue processing its customers'
parts.

On March 10, 2004, Doncasters informed Stack that it had
discovered lead contamination on its parts that Stack had
processed.  Stack investigated, and concluded that one of its

3 - OPINION AND ORDER

employees had left a hammer containing lead in the vacuum
furnace along with parts being processed, and that the high
temperatures in the furnace had caused lead particles to
disperse and contaminate parts being processed.  The hammer
was a tool normally used in Stack's operations, and was
normally present in Stack's facility.

Every load that was processed in the vacuum furnace
between February 24, 2004, and March 10, 2004, was
contaminated with lead during the heat-treatment process.
Doncasters rejected all parts Stack had processed during that
period, and demanded that Stack pay it $401,865.23 in
compensation for its damages.  Stack cleaned and restored the
furnace, but it could not be used for any commercial purpose
until May, 2005, and could be used only to treat non-medical
castings for some time after that.  The furnace was
ultimately recertified for its primary purpose.

Plaintiff Stack paid Doncasters the amount it demanded,
subsequently gave Travelers notice of its loss and of damage
to the vacuum furnace, and sought recovery of its damages
pursuant to an insurance policy that it had purchased from
defendant Travelers.  Stack in addition to its payment to
Dorcasters asserted that it had incurred covered damages of
lost business income in the amount of $100,776.00, and had
incurred covered expenses in cleaning and repairing the vacuum
furnace.  Travelers has paid some of the amounts requested,

but has denied coverage as to the damage to Dorcasters' parts and plaintiff Stack's alleged lost business income.

### CLAIMS, COUNTERCLAIMS, AND AFFIRMATIVE DEFENSES

Plaintiff Stack brings one claim for breach of contract, which is divided into six counts. As noted below, one of these counts has been withdrawn, and at least some of the damages sought as to two of the other counts are no longer in dispute.

Plaintiff has withdrawn the first count, which alleges that defendant Travelers breached "deluxe property coverage" provisions in its insurance policy by refusing to pay Stack's "claims for the direct physical loss and damage to its furnace." In its revised memorandum in support of its motion for summary judgment, plaintiff asserts that this count is withdrawn because it was ultimately able to have the damaged oven repaired and recertified "without incurring the $488,717.00 expense described in that count." Plaintiff adds, however, that the "deluxe property coverage" provision upon which Count 1 was based is relevant to other counts that remain. Stack alleges that the provisions in question "provided coverage for direct physical loss or damage to covered property, including machinery and equipment, labor and materials."

The second count alleges that a "deluxe property coverage" provision covered "direct physical loss or damage to

5 - OPINION AND ORDER

covered property, including machinery and equipment, labor, materials, or services furnished or arranged by the insured on personal property of others and the personal property of others in the care, custody, and control of the insured." Stack alleges that defendant Travelers breached this provision by refusing to pay for damages incurred "as a result of direct physical loss to its customer's property."

The third count alleges that defendant Travelers breached "deluxe property coverage" provisions of the policy, which provided additional coverage for debris removal. The parties agree that this count is now moot, because defendant Travelers has paid the expenses sought in this claim. Plaintiff has asked the court to issue an Order stating that this claim is moot, without prejudice to its right to recover for attorney fees related to this claim.

The fourth count alleges that defendant Travelers breached a "deluxe business income" provision requiring Travelers to reimburse plaintiff for business income it lost while the furnace was being cleaned and restored. Plaintiff seeks recovery of $100,776.00 under this claim.

The fifth count alleges that defendant Travelers breached a "deluxe business income" policy provision by failing to pay "extra expenses" plaintiff incurred because of the damage to the furnace. The parties agree that this count is now moot. As with count three, plaintiff has asked for an Order

declaring that the claim is moot, without prejudice to its
right to recover attorney fees related to the claim.

The sixth count alleges that defendant Travelers breached
a "products-completed operations hazard" policy provision by
failing to compensate plaintiff for the $401,865.23 that
plaintiff paid to Doncasters to compensate it for the medical
castings that were contaminated by lead in the furnace.

Defendant Travelers asserts fourteen affirmative
defenses, based upon various exclusions set out in the policy,
and upon an alleged lack of an "occurrence" and lack of
"property damage" within the meaning of those terms in the
policy.  Travelers also asserts two counterclaims, which seek
a judgment declaring that the policy does not cover the losses
plaintiff claims.

A Minute Order issued following a hearing concerning
the parties' cross-motions for summary judgment held on
December 19, 2006, noted that plaintiff's first count was
withdrawn, and that, except as to possible recovery of
attorney fees, counts three and five were deemed moot.  This
leaves the question of liability pending as to counts two,
four, and six.


## PENDING MOTIONS

Plaintiff Stack moves for summary judgment "as to all of
the counts in its Complaint that remain in dispute and as to
both of [defendant Travelers'] Counterclaims."

Defendant Travelers originally moved for a partial summary judgment establishing that plaintiff "is not entitled to coverage under the property coverage portion of the insurance contract for the cost of correcting or making good damage to its customer's medical castings attributable to the castings having been processed by Stack."  After plaintiff moved for summary judgment, defendant Travelers filed a cross motion for summary judgment "against Plaintiff on all claims and defenses in this matter not addressed in Defendant's motion for partial summary judgment, previously filed by Defendant."  Though there is some merit to plaintiff's contention that defendant's cross motion for summary judgment is untimely, both parties have fully briefed the issues raised by defendant's additional motion, and, in the interest of judicial efficiency, I will address that motion.

### STANDARDS FOR EVALUATING MOTIONS FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law.  The moving party must show the absence of an issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  The moving party may discharge this burden by showing that there is an absence of evidence to support the nonmoving party's case.  Id.  When the moving party shows the absence of an issue of material fact, the nonmoving party must go beyond

8 - OPINION AND ORDER

the pleadings and show that there is a genuine issue for trial.  Id. at 324.

The substantive law governing a claim or defense determines whether a fact is material.  T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).  Reasonable doubts concerning the existence of a factual issue should be resolved against the moving party.  Id. at 630-31.  The evidence of the nonmoving party is to be believed, and all justifiable inferences are to be drawn in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1985).  No genuine issue for trial exists, however, where the record as a whole could not lead the trier of fact to find for the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).


**DISCUSSION**

I.  Count Two: Coverage and Exclusions Under the "Deluxe Property Coverage Form"


A.  Exclusion of damage to personal property being "processed, manufactured, tested or otherwise being worked on"

Count two of plaintiff Stack's claim seeks reimbursement for damages incurred "as a result of direct physical loss to [Doncasters'] property."  In this count, plaintiff seeks

9 - OPINION AND ORDER

recovery of $350,000[1] of the $401,865.23 that it paid to reimburse Doncasters for its loss caused by the lead contamination of its medical castings.  Defendant Travelers contends that coverage for damage to Doncasters' castings is excluded under the policy.

The policy provisions relevant to Count Two are set out in the "Deluxe Property Coverage Form."  The relevant part of that form provides as follows:

> A. Coverage
>
> > We will pay for direct physical loss of or damage to Covered Property caused by or resulting from a Covered Cause of Loss.
>
> > 1. Covered Causes of Loss
>
> > > Covered Causes of Loss means RISKS OF DIRECT PHYSICAL LOSS unless the loss is:
>
> > > Excluded in Section B., Exclusions; Limited in Section C., Limitations; or Excluded or limited in the Declarations or by endorsements.
>
> > 2. Covered Property

---

[1]$350,000 is the policy limit for such loss under the "Deluxe Property Coverage Form."

Covered property, as used in this Coverage
Part, means the following types of
property described in this section A.2,
and limited in A.3, Property and Costs Not
Covered, if a Limit of Insurance is shown
in the Declarations for that type of
property.

**\*\*\*\***

b. Your Business Personal Property located
in or on the designated buildings at the
premises described in the Declarations or
in the open (or in a vehicle) within 1,000
feet of the described premises consisting
of the following unless otherwise
specified on the Declarations:

**\*\*\*\***

(2) Machinery and equipment;

**\*\*\*\***

c. Personal Property of Others that is:

11 - OPINION AND ORDER

                (1) In your care, custody, or
control; and

                (2) Located in or on the designated
buildings at the premises described
in the Declarations or in the open
(or in a vehicle) within 1,000 feet
of the described premises.

B. Exclusions

****

    2. We will not pay for loss or damage caused by
or resulting from any of the following:

****

        g.  The cost of correcting or making good
the damage to personal property
attributable to such property being
processed, manufactured, tested or
otherwise being worked upon.

12 - OPINION AND ORDER

Plaintiff Stack contends that Doncasters' castings that were damaged by lead deposits are "personal property of others," within its "care, custody, or control" that is covered under the policy provisions set out above. Defendant Travelers contends that the damage to Doncasters' castings is within the meaning of costs incurred for "correcting or making good the damage to personal property attributable to such property being processed, manufactured, tested, or otherwise being worked upon" which is excluded from coverage under Section B.2.g.

Plaintiff does not argue that it was not processing, manufacturing, or working on Doncasters' castings when they were contaminated by lead. Instead, it argues that to apply this exclusion would render the policy's coverage for personal property in its care or custody "illusory," and that exclusions that render coverage "illusory" are invalid. Plaintiff notes that it "seldom, if ever, has custody or control of the personal property of others for any purpose other than to process, test, or otherwise work upon that property." Plaintiff contends that, if coverage for property in its "care, custody, or control" does not extend to property that it is working on, the coverage is essentially meaningless and worthless.

The parties appear to agree that they can find no Oregon decisions directly addressing the exclusion for costs of "correcting or making good the damage to personal property

13 - OPINION AND ORDER

attributable to such property being processed, manufactured, tested or otherwise being worked upon," or addressing the issue of "illusory" coverage in a manner relevant to this case. My search for such Oregon cases has also been fruitless.

Defendant Travelers asserts that coverage must be determined under the terms of the exclusion as written, and contends that the exclusion here is "unambiguous on its face," and clearly applies to the damages that plaintiff Stack's processing caused to Doncasters' materials.

Plaintiff Stack relies on the decision by the Idaho Supreme Court in Martinez v. ICRMP, 134 Idaho 247, 999 P.2d 902 (2000). In Martinez, the Court stated that

> Since the policy creates only an illusion of coverage it is necessary that coverage for this case be afforded to [plaintiff], and [the insurer] is estopped from denying coverage because of the illusion of coverage it has created.

In analyzing the parties' cross motions for summary judgment on the first count, I need not determine whether Oregon courts would apply the same analysis as Idaho courts on this issue, or when Oregon courts might determine that an exclusion is invalid because it renders coverage "illusory": The exclusion in question here simply does not render the coverage for the loss of property of others that is in plaintiff's "care, custody, or control" illusory. Certainly, the record before the court establishes that plaintiff Stack regularly assumes the care and control of its customers' goods

14 - OPINION AND ORDER

in order to subject those goods to heat-treating processes,
and the record supports only the conclusion that the damage to
Doncasters' parts for which plaintiff seeks recovery
constituted a "direct physical loss" within the meaning of the
"Deluxe Property Coverage Form."  However, it appears
incontrovertible that, in addition to the possibility that
customers' goods might be damaged while "being processed,
manufactured, tested or otherwise being worked on," there are
numerous ways in which that property of others might be
damaged while in plaintiff Stack's control and custody.  Thus,
the property could be damaged by accidents or events such as
fire, flood, or theft, that would not be "attributable to such
property being processed, manufactured, tested or otherwise
being worked on."   The damage to Doncasters' parts for which
plaintiff seeks recovery in Count Two occurred while those
parts were in plaintiff's "care, custody, or control."
However, the damage occurred while that property was being
"processed . . . or otherwise being worked on."  The term
"correcting or making good the damage" is broad enough to
include plaintiff Stack's payment to Doncasters for the value
of the ruined castings.  Costs of "correcting or making good
the damage to personal property" attributable to the property
"being worked upon" is excluded under an unambiguous provision
of the policy.  Coverage of personal property in plaintiff's
care is not illusory, because potential losses occurring in a
variety of other circumstances are covered.  Accordingly,

15 - OPINION AND ORDER

defendant Travelers is entitled to summary judgment on Count
Two of plaintiff's complaint.

B. Other Exclusions to Coverage Under Deluxe Property Coverage
Form

        In addition to the exclusion discussed above, defendant
Travelers contends that coverage is excluded under other
provisions of the "Deluxe Property Coverage Form."  These
include a provision excluding payment for loss or damage
caused by "faulty, inadequate, or defective . . . [d]esign,
specifications, workmanship, repair, construction . . . or
[maintenance] of part or all of any property on or off the
described premises."  Deluxe Property Coverage Form
B.3.d.(2),(4).  Defendant Travelers also contends that the
damage to Doncasters' parts is excluded under a provision
excluding coverage for loss of personal property caused by
"[c]ontamination," id. at B.2.c.(6)(d), and a provision
excluding coverage for loss caused by "[d]ischarge, dispersal,
seepage, migration, release or escape of 'pollutants,'
. . . ."  Id. at B.2.h.

        The exclusion related to faulty design, workmanship, or
maintenance includes a provision stating that, though
defendant will not pay for loss or damage resulting from those
causes, "if an excluded cause of loss . . .results in a
Covered Cause of Loss, we will pay for the loss or damage
caused by that Covered Cause of Loss."  Id. at B.3.
Similarly, the exclusion of loss for damage resulting from

16 - OPINION AND ORDER

"contamination" provides that if this "excluded cause of loss
. . . results in a 'specified causes of loss' . . . [defendant
Travelers] will pay for the loss or damage caused by that
'specified causes of loss' . . . ." Id. at B.2.c.  Likewise,
the exclusion of loss for damage resulting from "pollutants"
does not apply "if the discharge, dispersal, seepage,
migration, release or escape of 'pollutants' results in a
'specified causes of loss.'" Id. at B.2.h.

     As discussed above, the exclusion of loss resulting from
damage attributable to plaintiff's processing of Doncasters'
parts discussed above applies and negates coverage of the loss
at issue in Count two.  As to this Count, I therefore do not
need to reach the question of the applicability of these
additional exclusions or address the meaning and validity of
the exceptions to the exclusions noted in the paragraph above.
However, in order to make a full record of my analysis of this
count, and because these issues also apply to Count four,
discussed below, I will briefly address these issues here.

     Based upon a careful review of the record and arguments
before the court, I am satisfied that these additional
exclusions would not preclude coverage if the exclusion for
damage to personal property of others being worked on while in
the insured's "care, custody, or control," which is discussed
above, did not.  The exclusion for faulty workmanship and
maintenance does not appear to apply because, in the context
of the other exclusions set out in part B.3, leaving a hammer

17 - OPINION AND ORDER

in a furnace is not an issue of faulty workmanship or
defective maintenance, but is instead a simple isolated
accident.  While the lead particles that attached to and
ruined Doncasters' parts could be characterized as
"contamination," in the context of the relevant exclusion,
that term appears to describe damage from external sources,
such as a general release into the environment, and not to
refer to "contamination" caused by plaintiff's own
manufacturing activities.   The damage to the parts in the
furnace does not appear to have resulted from the "discharge,
dispersal, seepage, migration, release or escape of
pollutants," which, like the exclusion for contamination,
appears to refer to damage arising from an external source.

    Even if these exclusions otherwise applied, the
convoluted exceptions to the exclusions noted above are
circular, incomprehensible, or ambiguous, and would render the
exemptions for workmanship and maintenance, contamination, and
pollution invalid.  These exceptions to the exclusions first
state that defendant will not pay for damages resulting from
the excluded causes, but will pay if the excluded cause of
loss results in a "covered" cause of loss or results in
"specified causes of loss."  The only definition of "covered
causes of loss" in the Deluxe Property Coverage Form"
identifies compensable causes of loss as "risks of direct
physical loss."  (The term "specified causes of loss" is not
defined, or distinguished from "covered causes of loss.")

Given that the policy applies to only "covered causes of loss," which are defined as "risks of direct physical loss," it is difficult to discern the intended meaning of provisions that first exclude payment for losses resulting from causes such as faulty maintenance, contamination, and pollution, and then negate those exclusions if these result in a "covered cause of loss" or "specified causes of loss."  Plaintiff's contention that these exclusionary clauses are circular has merit, as the exclusionary clauses in question appear to first negate coverage, and then to restore coverage by negating that negation.[2]

If the exclusions and limitations do not restore the coverage that is negated, they are ambiguous and subject to more than one plausible interpretation.  Such provisions in

---

[2]Inserting the relevant specific terms into the clauses that exclude or limit illustrates the circular nature of the exclusions.  The provision purporting to exclude coverage for damage caused by faulty maintenance, for example, would read as follows:

> We will not pay for loss or damage caused by or resulting from [faulty maintenance, but if faulty maintenance] results in [risks of direct physical loss] we will pay for the loss or damage caused by that [risk of direct physical loss.]

Here, if the act of leaving a lead hammer in the furnace were characterized as "faulty maintenance," that faulty maintenance resulted in a risk that the lead particles from the disintegrated hammer would damage Doncasters' parts that were subsequently treated in the furnace.  The lead contamination that resulted from the disintegration of the hammer rendered those parts worthless, and is fairly characterized as one of the "risks of direct physical loss" that might arise if a lead hammer is left in the furnace.

19 - OPINION AND ORDER

insurance policies are construed against the drafters, which
are the companies issuing the policies.   See, e.g., Hoffman
Construction Co. v. Fred S. James & Co., 313 Or. 464, 469-71,
836 P.2d 703 (1992) (delineating the factors used by Oregon
courts in determining the meaning of a provision in an
insurance policy).


II. Count Four: Coverage and Exclusions Under "Business Income
Coverage Form (And Extra Expense)"

Count four of plaintiff Stack's claim seeks recovery,
under a "Deluxe Business Income Coverage Form," for income
that plaintiff Stack lost while the damaged furnace was being
restored.   The "Business Form" provided that defendant
Travelers would

> pay for the actual loss of Business Income you
> sustain due to the necessary suspension of your
> "operations" during the "period of restoration."
> The suspension must be caused by direct physical
> loss of or damage to property . . . .   The loss or
> damage must be caused by or result from a Covered
> Cause of Loss.

Deluxe Business Income Coverage Form A.

As noted above, The Deluxe Property Coverage Form limits
"covered causes of loss" to "risks of direct physical loss,"
and does not further define "direct physical loss."

Defendant Travelers acknowledges that "contamination of
the furnace arguably caused Stack to lose business income
because it was unable to heat treat parts for one of its
customers, Doncasters."   It contends, however, that the

20 - OPINION AND ORDER

"business income coverage" provision was not triggered because the damage to the furnace did not result in a "necessary suspension" of Stack's operations, and because Stack did not lose income "due to a 'direct physical loss of or damage to property'" that was caused by or resulted from a "covered cause of loss."

A. Suspension of operations

The policy defines "operations" as the insured's "business activities occurring at the described premises." Defendant Travelers correctly notes that plaintiff Stack operated the special vacuum furnace for several days after the hammer disintegrated before discovering that the parts processed in the furnace were contaminated, and argues that the furnace "remained completely operable" despite the contamination. Because the furnace could be used to process some products even after it was contaminated, defendant Travelers contends that Stack's operations were never "necessarily suspended" within the meaning of the policy.

This argument fails. The furnace in question was used almost exclusively to treat Doncasters' medical products, and after the contamination was discovered, it could not be used for its usual purpose until it had been restored and recertified. The fact that the contamination was not immediately discovered, and the fact that the furnace could perhaps have been used for purposes other than that for which it was principally intended, did not mean that this part of

Stack's business was not "necessarily suspended" within the meaning of the policy.  After it was contaminated, the furnace could not be used for the insured's intended business purpose without being repaired and recertified, and there is no question that plaintiff Stack sustained a loss of business income before those steps could be completed.

I note that defendant Travelers did pay the cost of debris removal and certain other extra expenses plaintiff Stack sustained while the furnace was being restored.  At least some of those costs were paid pursuant to coverage under the "Business Income Coverage Form (and Extra Expense)" provisions of the policy.  Such payment would appear to correctly acknowledge that the expenses were incurred due to a "covered cause of loss," and would appear to correctly acknowledge that, as to the particular furnace in question, Stack's operations were necessarily suspended until repairs were completed.

Even if defendant Travelers had not made these payments, I would conclude that plaintiff Stack's business operations were "necessarily suspended," within the meaning of the applicable policy provisions, following the disintegration of the hammer in the furnace.

B.  Coverage of "Direct Physical Loss of or Damage to Covered Property"

As noted above, the Deluxe Property Coverage Form requires defendant Travelers to compensate its insured only for "direct physical loss of or damage to Covered Property caused by or resulting from a Covered Cause of Loss."

Defendant Travelers contends that the only "direct physical damage" sustained to plaintiff Stack's property was the loss of the dead-blow hammer that disintegrated in the furnace.  It argues that, because the furnace could still be used to treat materials other than medical devices after it was contaminated, it did not suffer "physical damage."

This argument fails.  Though the terms "direct physical loss" and "physical damage" are not defined in the policy, it is only logical to conclude that the physical change in the furnace resulting from a release of lead particles, which prevented it from being used for its ordinary expected purpose, is fairly characterized as a "direct physical loss of or damage to" the furnace, which, unlike the parts processed in the furnace, was clearly "covered property" within the meaning of the policy.  There is no question that the physical transformation of the furnace which rendered it useless for processing medical devices, the use for which it was specially certified, reduced both the value of the furnace and plaintiff's ability to derive business income from the

23 - OPINION AND ORDER

furnace.  This reduction of value was caused by an incident
that is fairly characterized as "direct physical damage."

C. Other Exclusions

Because the "business income" provision covers only those
losses resulting from a "covered cause" that is not excluded,
the exclusions discussed above, if applicable, would also
negate coverage for lost business income.  Those exclusions,
and my reasons for concluding that they do not apply, are
discussed above.

III.  Count Six: Coverage and Exclusions under the "Commercial
General Liability Coverage Form"

The policy in question includes a separate "Commercial
General Liability Coverage Form" which requires Travelers to
pay "those sums that the insured becomes legally obligated to
pay as damages because of 'bodily injury' or 'property damage'
to which [this] insurance applies."  Commercial General
Liability Coverage Form I.1.a.  This portion of the policy
covers "property damage" that is caused by an "occurrence"
that takes place "in the 'coverage territory. . . .'"    In
Count 6 of its claim, plaintiff Stack alleges that this
coverage requires defendant Travelers to pay for the castings
that were damaged by lead contamination.

Section 2.j.(4) of the Commercial General Liability
Coverage Form excludes damage to "[p]ersonal property in the
care, custody, or control of the insured."  Section 2.j.(6)

excludes "[t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it." This exclusion "does not apply to 'property damage' included in the 'products-completed operations hazard.'" Id.  The term "products-completed operations hazard" is defined as damage "occurring away from premises you own or rent and arising out of 'your product' or 'your work' . . . ." Commercial General Liability Coverage Form § 14.a.  "Your work" is defined as "[w]ork or operations performed" by or on behalf of the insured, and "[m]aterials, parts or equipment furnished in connection with such work or operations."  Section 2.f. excludes coverage for property damage arising out of "discharge, dispersal, seepage, migration, release or escape of pollutants . . . at or from any premises, site or location which is or was at any time owned or occupied by . . . any insured . . . ."

Travelers contends that the exclusion of coverage for damage to property in plaintiff's "care, custody, or control" applies because Doncasters' castings were indisputably within Stack's "care, custody, and control" when they were damaged by the lead contamination.  I agree.  It was Stack's treatment of the castings, while they were in its custody and control, that damaged the castings.  I also agree that the exclusion of coverage for the damage to a "part of any property that must be restored, repaired, or replaced" because of the insured's work was "incorrectly performed on it" applies.  Plaintiff

Stack is attempting to recover the cost of replacing Doncasters' parts which were damaged while being processed in a furnace in which the work could not be correctly performed after the diffusion of lead particles from a disintegrated hammer.  The exception to this exclusion that applies to "products-completed operations hazard" is inapplicable here because the damage for which plaintiff Stack seeks recovery occurred in its own furnace at its own premises.

Though my conclusion that other exclusions apply makes it unnecessary to reach this issue, I note my disagreement with defendant Traveler's assertion that the "pollution" exception applies, because the dispersal of lead particles in the furnace does not appear to constitute "pollution" within the meaning of the relevant exclusion.

Plaintiff contends that the coverage it purchased would be "illusory" if these exclusions are enforced, because its entire business consists of treating materials sent to it by others.  As with plaintiff's argument about "illusory" coverage discussed above in the context of other policy provisions, I disagree.  Though the policy does not cover damage to the property of others occurring while it is in plaintiff Stack's custody, it would cover bodily harm caused by products plaintiff worked on after those products left plaintiff's facility.  Though the particular loss for which plaintiff Stack seeks recovery under Count six is excluded, coverage under the "Commercial General Liability Coverage

Form" is not "illusory," because some kinds of potential loss are covered under that portion of the policy.

Defendant Travelers is entitled to summary judgment on this count.

## CONCLUSION

Plaintiff's motion for summary judgment (#62) is Granted in Part and Denied in Part.  The motion is GRANTED as to the fourth count in plaintiff's claim, and is DENIED as to the second and sixth counts.

Defendant's cross motion for summary judgment (#66) is Granted in Part and Denied in Part.  The motion is GRANTED as to the second and sixth counts of plaintiff's claim, and is DENIED as to the fourth count.

Because it has been superseded by defendant's cross motion for complete summary judgment, defendant's earlier motion for partial summary judgment (#31) is DENIED as moot.

DATED this 7th day February, 2007.

_____
John Jelderks
U.S. Magistrate Judge